Filed 10/28/25 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ADOPTION OF X.D., a Minor. | B343632 |
| _____ | (Los Angeles County Super. Ct. No. 22CCAD00870) |
| CLIFF D. et al., | |
|     Plaintiffs and Appellants, | ORDER MODIFYING OPINION AND DENYING REHEARING |
|     v. | |
| RAYMON M., | [NO CHANGE IN JUDGMENT] |
|     Objector and Respondent; | |
| JESSICA W., | |
|     Intervener and Appellant; | |
| X.D., a Minor, etc., | |
|     Appellant. | |
| _____ | |
| RAYMON M., | B343634 |
|     Objector and Respondent, | |
|     v. | |
| JESSICA W., | |
|     Intervener and Appellant. | |

BY THE COURT:

It is ordered that the opinion filed herein on September 29, 2025, be modified as follows:

1.  On page 4, the following sentence is deleted:

    > In 2010, he was convicted of kidnapping and forcible rape/unlawful sexual abuse for which he served a five-year sentence.

    It is replaced with:

    > In 2010, he was charged with kidnapping, forcible rape, human trafficking, and other felony counts; he pled to one count of human trafficking for which he served a 5½-year sentence.

2.  On page 5, the following sentence is deleted:

    > He choked her on three occasions.

3.  On page 8, the first sentence of the last paragraph is deleted and replaced with the following:

    > "[A] little after [Jessica] left" Raymon, she received from Raymon's sister, Rubye, a text message containing screenshots of three consecutive texts Rubye had received from Raymon from his mobile number (650) 458-xxxx.

4.  The following two paragraphs from pages 8 and 9 are moved to page 7, before the paragraph starting with "In late September 2021 . . . ,":

    > "[A] little after [Jessica] left" Raymon, she received from Raymon's sister, Rubye, a text message containing screenshots of three consecutive texts Rubye had received from Raymon from his mobile

number (650) 458-xxxx.  Rubye had saved Raymon's mobile number under the contact name "Lil Big Brother."[1]

The three texts were time-marked over a two and one-half hour period.  The messages were:

(1) "I think Jessica left me for some body else she cheating on me she so fucken cold hearted that bitch ain't shut I swear to god that bitch cheating on me."

(2) "U let her fucken no I no she got another nigga and *ima kill all them morherfuckas I hate that sneaky cheating as bitch*." (Italics added.)

(3) "I called from some one else phone that bitch hung up on me *cheating bitch when I ketch her ima kill that selfish bitch I hate her with all my hear I swea[r] I'll go to jail for life cheating ass bitch fuck everything ima make that bitch hurt that bitch is my enimie I ho she die and that baby she carrying die evel bitch*."  (Italics added.)"

5. On page 11, the last paragraph is modified to include the addition of a new sentence.  The new sentence is placed before the words, "That Saturday," and the last paragraph

---

[1] The screenshots were marked as exhibit P-107, which the trial court did not admit into evidence.  We discuss the significance of these texts and the court's ruling in Part A of our Discussion.

3

now reads as follows:

> Jessica stated that, during this time, Raymon "begged" to see Ray but she was anxious about visitation. Ultimately, in November 2022, Jessica agreed that she and Ray would visit and stay at Raymon's mother's house on the condition that Raymon provide financial support. Raymon agreed and gave her $400. Jessica and Ray spent the weekend before Thanksgiving of 2022 at Raymon's mother's home. According to Raymon, they stayed in the same bed. That Saturday, with X.D. now six months old and living with his prospective adoptive parents, Raymon asked Jessica "So whatever happened to the baby?" She said, "The baby is not here no more," and Raymon left it at that. Raymon testified he believed Jessica had miscarried because there was "no baby present."

There is no change in the judgment.

Objector and Respondent Raymon M.'s petition for rehearing is denied.

_____
RUBIN, J.*        WILEY, Acting P. J.      VIRAMONTES, J.

---

\*      Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

4

Filed 9/29/25 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ADOPTION OF X.D., a Minor.<br>_____<br>CLIFF D. et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>RAYMON M.,<br><br>    Objector and Respondent;<br><br>JESSICA W.,<br><br>    Intervener and Appellant;<br><br>X.D., a Minor, etc.,<br><br>    Appellant.<br>_____<br>RAYMON M.,<br><br>    Objector and Respondent,<br><br>    v.<br><br>JESSICA W.,<br><br>    Intervener and Appellant. | B343632<br><br>(Los Angeles County<br>Super. Ct. No. 22CCAD00870)<br><br><br><br><br><br><br><br><br><br><br><br><br><br>B343634 |

CONSOLIDATED APPEALS from findings and orders of the Superior Court of Los Angeles County, Nichelle Blackwell, Juvenile Court Referee. Reversed and remanded with directions.

John L. Dodd & Associates and John L. Dodd for Plaintiffs and Appellants.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Minor and Appellant.

Joseph T. Tavano, under appointment by the Court of Appeal, for Intervener and Appellant.

Leslie A. Barry, under appointment by the Court of Appeal, for Objector and Respondent.

_____

**INTRODUCTION**

Baby Boy W., born on May 10, 2022, was given a name with the initials X.D. at birth and has lived with his prospective adoptive parents, Cliff and Rebecca, his entire life.[1] X.D.'s biological mother, Jessica, had placed him for adoption on the day he was born.

Jessica had long suffered from physical and verbal abuse by X.D.'s biological father, Raymon. Two weeks after learning they were expecting their second child, Raymon hit Jessica in the face, causing a bloody lip; this led her to leave Raymon and seek refuge at a domestic violence shelter with the couple's then-only child, Raymon, Jr. (Ray). Following a barrage of angry voicemails and threats, Jessica cut off all communication with Raymon. She did

---

[1]     We refer to Baby Boy W. as "X.D." For ease of reference and without intending disrespect, we refer to the prospective adoptive parents and the biological parents by their first names.

not see him again until six months after X.D.'s birth, at which point she told Raymon that the baby "is not here no more." Raymon believed Jessica had miscarried.

The prospective adoptive parents proceeded with adoption. On January 12, 2023, Raymon was notified of adoption proceedings and of X.D.'s birth. He opposed the adoption in court filings and claimed he qualified as a *Kelsey S.* father.[2] The trial court agreed with him.

X.D., his prospective adoptive parents, and Jessica all appeal the trial court's ruling. They contend Raymon did not qualify as a *Kelsey S.* father because he did not contribute to his child's well-being during pregnancy and because substantial evidence does not support the trial court's ruling. Appellants also contend the trial court prejudicially erred in excluding trial exhibit P-107—screenshots of text messages in which Raymon threatened to kill Jessica and their unborn child.

We agree with appellants and reverse.

We conclude the trial court erred in excluding exhibit P-107; the screenshots were sufficiently authenticated and relevant to the trial court's determination of whether Raymon qualified as a *Kelsey S.* father, and were otherwise admissible. We also conclude that, once exhibit P-107 is considered part of

---

[2]     *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849 (*Kelsey S.*) [If an unwed biological father, who was precluded from asserting his parental rights as a result of the mother's actions, "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise— his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent."].

the evidentiary record, insufficient evidence supported the trial court's decision. Lastly, the record demonstrates that it is not in X.D.'s best interest for Raymon to retain parental rights per Family Code section 7664, subdivision (b). On remand, we direct the trial court to allow the adoption to proceed.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. ***The Birth Parents' Prior History***

In 2020, 23-year-old Jessica met 32-year-old Raymon while they were both residents at a substance abuse program called Divine Detox in Simi Valley. Raymon sought treatment to recover from cocaine and alcohol addiction. At the time they met, Raymon had a lengthy criminal record and was on parole. In 2009, he had been convicted of second degree robbery. In 2010, he was convicted of kidnapping and forcible rape/unlawful sexual abuse for which he served a five-year sentence. In 2015, he was convicted of two separate instances of attempted second degree robbery and sentenced to four years in prison; he was released in 2019.

Against the rules of the program, Raymon and Jessica developed a sexual relationship and "ultimately became a couple." They never married.

When Jessica, now sober, was six months pregnant with her first child (not X.D.), she and Raymon graduated from the program. They lived part of the time in an apartment in Santa Clarita and part-time with Raymon's family in East Palo Alto. While she was seven months pregnant, Raymon choked her during an argument, "causing her to lose her breath for 15 to 20 seconds." Jessica found a "white substance" and "baggies with a residue of a substance" in their apartment. Raymon referred to

4

his cocaine and alcohol abuse as "weekend binges." He relapsed four times during the four-month period leading up to the child's birth. Their first child, Ray, was born in May 2021.[3]

At Ray's birth, Jessica was sober; Raymon was not. According to Jessica, their relationship "was tumultuous" and led to incidents of domestic violence. He was "physically and mentally abusive" towards her and called her "derogatory names." He choked her on three occasions. While they were staying with Raymon's family in East Palo Alto, Raymon "use[d] drugs, [was] absent from the home on weekends, and he engaged in another altercation by thumping [Jessica] on her head while she was bottle feeding [Ray], which caused her to fall."[4] The "bottle went flying in the air and hit the baby in the head." Jessica confronted Raymon about his drug use multiple times and told him he "shouldn't be using." During an argument, he pushed her up against the wall and had his hands around her neck; his behavior "frighten[ed]" her, especially as he was "significantly larger" than she was. While they were living with his parents, Raymon once threatened to kill Jessica.

B.  ***The Final Act of Physical Domestic Violence and Its Aftermath***

On September 7, 2021, Jessica took a home pregnancy test which registered positive. Raymon was present and reviewed the test results with Jessica. He was "happy" to have another child; Jessica was not and, in front of Raymon, began "looking up

---

[3]  Raymon also has a daughter from a previous relationship but did not have custody.

[4]  Jessica defined "thumping" as "shoving my head."

doctors to abort." Raymon told his sister Rubye and his mother about Jessica's pregnancy. (This is the pregnancy that resulted in the birth of X.D.)

Two weeks later, on September 21, 2021, Jessica and baby Ray were seated in the backseat of a vehicle that Raymon was driving. Raymon was on the speaker phone in a heated argument with his mother. Jessica was soothing Ray and told Raymon he "should not talk to his mother in a disrespectful manner." Raymon then turned "back and hit [Jessica] in [her] mouth and busted [her] lip." Her lower lip started bleeding. When Raymon stopped at a red light, Jessica grabbed Ray, got out of the car, ran into a nearby fast-food restaurant, and locked Ray and herself in the bathroom. She then called the police and her friend Angie Vasquez.[5] Raymon drove off because he was "concerned that the police were going to come." When law enforcement arrived, Jessica did not identify her assailant because she was concerned about Raymon's "two felony convictions" and "didn't want him to get in trouble." The police took her to a local Walmart to purchase a car seat for Ray. She and Ray then stayed at Angie's house for three days.

Angie helped Jessica find a domestic violence shelter in Long Beach. During this time, Jessica (still pregnant with X.D.) had "very little" communication with Raymon, who had promised he "won't do that again." Jessica stated Raymon would regularly apologize after his abuse. Jessica and baby Ray moved into the

---

[5]     Angie previously worked as a "sober coach" at Divine Detox and met Jessica in 2019 at the program. After graduating, Jessica maintained contact with Angie and developed a friendship. Angie also knew Raymon from the program.

6

domestic violence shelter (DV shelter) and stayed for 25 days. During that time, Jessica was not permitted contact with Raymon.

In late September 2021, while Jessica was still at the DV shelter, Raymon called Jessica's friend, Angie, and sent her text messages inquiring about Jessica. Angie told him Jessica was in a shelter and could not have contact with anyone. Angie texted back: "[Y]ou should never put your hands on anybody, especially your child's mother." Raymon replied, "U right I should have never did that and I promised her it will never happen again I was wrong . . . I won't lose it aga[in]." In another text, Raymon stated, "I fucked up" and "I'm realy [*sic*] not a bad person I lost it."

On September 23, 2021, Raymon left three voicemails for Jessica, even though Angie had informed Raymon that Jessica could not have contact with him while she was living at the DV shelter.[6] Raymon's first voicemail was: "Just answer the fucking phone, bro. Where is my son? It's 8 o'clock, bruh. Come on, bruh, you've taken it too far. I slapped you because you was coming between me and my mama . . . . You wrong, bro." His second voicemail: "I may punch and fight, and you may be scared when I get mad. I'm not gonna hurt you. I love you, bud. Like, why are you doing this to me, bruh? I don't have a heart to do this shit to you." The third voicemail: "Let me tell you about yourself, you fucking dyke. . . . I was depressed all day thinking about how I got to let my fucking baby go. How we got to get a fucking abortion. . . . You talking about my attitude? I ain't put

---

[6]     The transcripts of the voicemail messages formed exhibit P-126, which the trial court admitted into evidence.

7

my hands on you for nothing in a long time, bruh.  I just been trying to figure out shit, man."

The next day, Raymon left her three more voicemails, stating, "Answer my fucking phone calls.  You selfish bitch. . . . I swear to God . . . I'm doing everything I can to hurt you, bruh." He also alluded to taking some legal action: "I really don't want to do this, bruh but you're forcing me bro, so I have to make a complaint and then from there, bro, I have to do some type of shit with the court, but I really don't want to go there, bro.  Like, are you going to force me to go there?"  He attributed Jessica's reaction to "hormones, because you're like 3 months pregnant. And um I'm gonna be real patient with you."

About a month later, Raymon and Jessica spoke on the telephone for "the first time" since he had hit her in the car. Raymon asked if he could give Jessica money for "prenatal pills." She declined.  Soon thereafter, Jessica and baby Ray moved from the DV shelter to a sober living facility for women and children. They lived there for the next year and a half.

When Jessica was two or three months pregnant, she received from Raymon's sister, Rubye, a text message containing screenshots of three consecutive texts Rubye had received from Raymon from his mobile number (650) 458-xxxx.  Rubye had saved Raymon's mobile number under the contact name "Lil Big Brother."[7]

---

[7] The screenshots were marked as exhibit P-107, which the trial court did not admit into evidence.  We discuss the significance of these texts and the court's ruling in Part A of our Discussion.

The three texts were time-marked over a two and one-half hour period. The messages were:

(1) "I think Jessica left me for some body else she cheating on me she so fucken cold hearted that bitch ain't shut I swear to god that bitch cheating on me."

(2) "U let her fucken no I no she got another nigga and *ima kill all them morherfuckas I hate that sneaky cheating as bitch*." (Italics added.)

(3) "I called from some one else phone that bitch hung up on me *cheating bitch when I ketch her ima kill that selfish bitch I hate her with all my hear I swea*[r] *I'll go to jail for life cheating ass bitch fuck everything ima make that bitch hurt that bitch is my enimie I ho she die and that baby she carrying die evel bitch*." (Italics added.)

Over the next few months, Raymon continued to leave voicemails for Jessica, apologizing for his behavior. She did not respond. On November 7, 2021, Raymon left the following message, "I don't even know if you're still pregnant or not." That same day, Raymon attempted to file a missing person's report, claiming that Jessica was being held captive against her will.

On December 1, 2021, Raymon left Jessica another voicemail, telling her she may use his Electronic Benefit Transfer (EBT) card "for you and my son."[8] On December 15, 2021, he left a message stating, "I hope your pregnancy is going smooth. If you're still are pregnant. I hope you are, but if you're not, I still love you." Rubye sent Jessica $647 in November and December

---

[8] "[M]y son" was an apparent reference to Ray, as X.D. had not yet been born.

2021. Jessica began to receive money from Raymon's mother "starting sometime in 2022."

On February 25, 2022, Raymon left Jessica another message that stated, "thinking of [Ray] every day, even my unborn, if there still is an unborn." According to Jessica, in the "handful of times" that Jessica and Raymon spoke or exchanged voicemails, he mainly inquired about Jessica and Ray, and asked about the pregnancy "[m]aybe two" times.

C.    ***X.D. is Born and Placed with Prospective Adoptive Parents***

On May 10, 2022, Jessica gave birth to X.D. His birth certificate lists Jessica as the mother and the father as "unknown." About two weeks before X.D. was born, Jessica had contacted an adoption agency, Vista Del Mar Child and Family Services, and participated in its selection process for potential adoptive parents. She submitted a declaration to the adoption agency where she identified the "possible birth father" as Raymon. She also stated she did not know Raymon's address but indicated he might be living in the Bay Area. In her declaration, in response to why she was "unable to identify the birth father," she wrote: "We weren't together long he became abusive and I had to leave the situation urgently." She identified Ray as being a "full" sibling to X.D.

On May 12, 2022, X.D. was released from the hospital and immediately placed in the custody of prospective adoptive parents Cliff and Rebecca. The couple had been pursuing adoption for two years. By the time of the subsequent trial proceedings, Cliff, Rebecca, and X.D. had been "living as a family unit since they brought [X.D.] home from the hospital." They "fell

10

in love the moment that [X.D.] started opening his eyes and looking at us, and bonding has just been a beautiful experience."

On May 13, 2022, Jessica executed a relinquishment form, naming Cliff and Rebecca as X.D.'s prospective adoptive parents. As Jessica had physical custody of X.D.'s brother Ray, she and Rebecca discussed "letting the brothers get to know each other with playdates at an appropriate age."

From May through December 2022, Jessica received $7,488 from Raymon's mother, who indicated the money was "from Raymon sometimes; sometimes from herself." According to Jessica, Raymon's mother would tell her to "buy diapers, buy food, buy whatever you need for you and [Ray]." Raymon's mother never told Jessica the money she gave was for X.D. "[S]everal times," Raymon provided funds via Western Union for Ray's care. Jessica said Raymon never paid formal child support.

Jessica stated that, during this time, Raymon "begged" to see Ray but she was anxious about visitation. Ultimately, in November 2022, Jessica agreed that she and Ray would visit and stay at Raymon's mother's house on the condition that Raymon provide financial support. Raymon agreed and gave her $400. Jessica and Ray spent the weekend before Thanksgiving of 2022 at Raymon's mother's home. That Saturday, with X.D. now six months old and living with his prospective adoptive parents, Raymon asked Jessica "So whatever happened to the baby?" She said, "The baby is not here no more," and Raymon left it at that. Raymon testified he believed Jessica had miscarried because there was "no baby present."

D.     *Formal Adoption Request and Raymon's Declaration Opposing Adoption*

Departing from our chronological description of events, back on June 8, 2022, Cliff and Rebecca filed in the trial court a request that the court approve their adoption of X.D., then one month old.  The request identified Jessica as X.D.'s biological mother and Raymon as the alleged father.  Cliff and Rebecca asked the court to terminate Raymon's parental rights.

Six months later, on January 12, 2023, Raymon was served with a notice of alleged paternity of X.D. that the prospective adoptive parents had filed.  The notice advised Raymon that he was required to file an action within 30 days should he wish to establish paternity and contest the adoption.  Raymon contacted Jessica the next day but she denied having given birth; she told Raymon, "that is a lie, there is no baby and no adoption."  Jessica then stopped responding to Raymon's calls.

Three weeks later, on February 3, 2023, Raymon filed a declaration in court stating he is "100% against and contest[s] any adoption" and would like to establish paternity.  He stated: "I can't even express in words the emotions that came over me after . . . reading . . . that petition. . . . [Jessica] became pregnant with . . . our second child together [when] we were living together.  I repeatedly and contin[u]ously asked [Jessica] about the status of the pregnancy and she used to get very upset."  While Jessica and Ray were in a shelter for women and children, "[w]e both had things to work on in our lives and I respected what she was trying to do [while] she was in the shelter for over a year and a half."  He continued that in November 2022, Jessica "notified" Raymon and his parents that she "had miscarried our second child," which "devastated" him.  He "believed at that time

12

that [Jessica] had lost our baby." He did not know of X.D.'s existence until he was served with the notice of alleged paternity. "To be told that the mother of your expected child[] miscarried[,] only to find out later [X.D.] was born and in the process of being given up for adoption is one of the most traumatizing events that has occurred in our lives."

E. ***Prospective Adoptive Parents' Petition to Determine Raymon's Parental Rights***

On March 6, 2023, Cliff and Rebecca filed a petition to determine the parental rights of alleged father Raymon and whether his consent was required for adoption pursuant to Family Code section 7662.[9] They asserted that Raymon's consent was not necessary and requested that the court terminate his parental rights, assuming he had any.

On December 6, 2023, the adoption agency filed a report informing the court the following: Jessica had provided the adoption agency with a declaration stating Raymon is X.D.'s biological father and that she and Raymon never married; she terminated their relationship because he became "abusive" and they are not in contact. Jessica's declaration also stated Raymon "did not give her money or items to help with the pregnancy or child support expenses." She did not know where Raymon "currently is and does not have his contact information" other than "he may be residing in the San Francisco Bay [A]rea." The adoption agency's report provides that the adoption process could not proceed because a court determination of Raymon's parental rights was necessary.

---

[9] Undesignated statutory references are to the Family Code.

13

At hearings held December 7, 2023, and January 11, 2024, separate counsel were appointed for Raymon, Jessica, and X.D.

On January 17, 2024, when X.D. was approximately 20 months old, Raymon sent the prospective adoptive parents a greeting card for X.D., along with a cashier's check for $250. Cliff and Rebecca responded with a card and said they used the "generous gift" to pay for X.D.'s swim classes. Raymon sent another $250 in February, April, July, and October 2024. Raymon did not send birthday or Christmas gifts for X.D.

At a status hearing held March 14, 2024, the court appointed Dr. Nancy Kaser-Boyd as the expert to interview and conduct a psychological evaluation of the parties pursuant to Evidence Code section 730.

The parties stipulated to a paternity genetic testing, and on March 26, 2024, the test results indicated a 99.99 percent probability that Raymon was X.D.'s biological father.

F. ***Prospective Adoptive Parents' Petition to Terminate Raymon's Parental Rights***

On May 14, 2024, Cliff and Rebecca filed a petition for freedom from parental custody and control pursuant to section 7822. The petition alleged that Raymon physically and emotionally abused Jessica both prior to and during Jessica's pregnancy. Raymon did not assist with any of the pregnancy-related expenses nor attend any of Jessica's medical appointments. The petition alleged that (1) X.D. has lived with Cliff and Rebecca since his birth; (2) Raymon never assumed any parental responsibility for X.D.; and (3) Raymon never filed an action to establish a parent-child relationship with X.D. The petition also alleged that Raymon did not provide any support for X.D. "other than token efforts to provide support . . . only after

14

the commencement of th[is] action."  The prospective adoptive parents argued Raymon did not qualify as a presumed father under *Kelsey S.*, and that it was in X.D.'s best interest for the court to terminate Raymon's parental rights.

The probation officer's report, filed June 21, 2024, recommended that the court grant Cliff's and Rebecca's petition to terminate Raymon's parental rights.  The report found X.D. had no contact with Raymon; on the contrary, Cliff and Rebecca have been "the only ones who have provided care, supervision, and love."  X.D. has been "thriving in a loving home" and "appeared to be very attached" to Cliff and Rebecca.  The probation officer recommended the adoption process proceed as Cliff and Rebecca are "able and willing to continue to raise, adopt, and provide a loving home for [X.D.]"

G.  ***Dr. Kaser-Boyd's Report***

Dr. Kaser-Boyd's evaluation report was filed on October 14, 2024, and later admitted into evidence.

Dr. Kaser-Boyd did not recommend that the biological parents be allowed to visit X.D.  "If visitation becomes part of a Post-Adoption Agreement, the rules need to be very clear, given the history of antisocial behavior."  (Italics omitted.)  Raymon's "criminal convictions, the drug use, and the domestic violence strongly indicate a personality disorder.  It is of concern as well that one of his earlier convictions was for sexual offenses, though apparently he did not have to register as a sex offender."  (Italics omitted.)  Raymon "has not raised his older daughter and he does not appear to be contributing to the rearing of his namesake [Ray]."  (Italics omitted.)  Jessica remains "very guarded about contact between Raymon and [Ray] because of the history of

15

domestic violence.  Jessica is rearing [Ray] by herself."  (Italics omitted.)

When Dr. Kaser-Boyd asked Raymon "why the relationship ended," he became "somewhat vague"; he alluded to an argument and said that "because the financing wasn't working because of the pandemic, she grew disenchanted."  He said he "simply could not answer why she would . . . put the baby up for adoption without informing him."  To Dr. Kaser-Boyd, it "seemed clear that he was denying a history of domestic violence."  Dr. Kaser-Boyd "thought [Jessica] was credible in her account as she talked about being choked while pregnant [with Ray].  She got very tearful. [¶] She also was, like other battered women, quick to say that Raymon was nice when he was sober.  It was only when he was using that he was violent, . . . battered women also make excuses."

"The issues of greatest concern to this evaluator are the domestic violence of [Raymon] towards Jessica, and his earlier case involving sexual offenses.  I understand that he choked Jessica while she was pregnant and this is quite a high level of domestic violence and disregard for the safety of his child.[10]  His violence towards Jessica, [toward] the female victim of the sexual offenses in 2010, and the male victims of the robberies in 2015, may have been related to his cocaine abuse; however, a psychological evaluation by itself can't inform the [c]ourt about whether he has achieved long-term sobriety.  If he has not, he remains a risk to a young child, as well as to that child's caretaker(s)."  (Italics omitted.)

---

10     Dr. Kaser-Boyd was apparently referring to Jessica's pregnancy with Ray.

16

Dr. Kaser-Boyd observed X.D. with Cliff and Rebecca. She opined that it is "clear that this is a family unit, and [X.D.] sees [Cliff] and Rebecca as his parents." The attachment is a "strong" one, and X.D. is "clearly very bonded to the prospective adoptive parents." (Italics omitted.) He "knows no other parents than [Cliff] and Rebecca." (Italics omitted.) She concluded that disrupted attachment at X.D.'s age can lead to "mourning and depression and long-term disruptions in trust and security" which can "impact his ability to form a new attachment to a caregiver." (Italics omitted.)

## H. *Trial*

Trial took place on November 4–8, 22, and December 6, 2024. The court heard testimony from Jessica, Raymon, Angie, Cliff and Rebecca, and Dr. Kaser-Boyd. Their testimony, along with other evidence, forms the basis of our recitation of the facts and case history above.

Raymon testified he continued to use drugs in 2021, 2022, and 2023. He admitted he was verbally abusive to Jessica. He admitted to having called her a "dyke" and a "selfish bitch." However, he denied having hit Jessica while they were in the vehicle on September 21, 2021—testimony the court did not find credible. He acknowledged that the money he gave to Jessica was meant for her and Ray, not X.D.

Raymon also testified that in 2015 he filed a petition seeking custody of and visitation with his daughter from a previous relationship, but was unsuccessful. When asked why he filed the petition, he answered, "To be honest with you, I didn't know what I was doing. I filed anything I can because I knew I was on my way to prison for four years." He was "trying to get some rights of custody and visitation" of his daughter.

17

At the time of trial, Raymon resided at an in-patient program; he was there voluntarily and stated he would move back to his parents' house should he obtain custody. X.D. "has his own room at my house right now. . . . I have daycare locked up for him, My Little Disciples Preschool. [¶] I'm currently on disability so I've got 24 hours out [of] the day to spend with my son." Raymon had completed one parenting class and enrolled in a second parenting class that he was "9 or 10 weeks in for." He completed a 12-step recovery program and has "been in therapy for the past year."

As for exhibit P-107, the screenshot messages, the parties argued extensively as to its admissibility. Prospective adoptive parents proffered it to show Jessica's mental state and reasonable fear of Raymon and argued the exhibit is admissible for both hearsay and non-hearsay purposes.

To authenticate the exhibit, Jessica testified she knew Raymon had "threatened to kill [her] and [her] unborn child" and referred to a text message she received from Rubye concerning "a communication by [Raymon] that contained threats" against Jessica.

During trial on November 6, 2024, the trial court asked counsel, "Did you authenticate the telephone number with [Raymon]?" Counsel for prospective adoptive parents answered, "Yes, I did." Counsel for Raymon confirmed and stated, "He did do that." After further exchange, the court asked once more, "But was the phone number of [Raymon] established? Did you establish this is his phone number?" Raymon's counsel confirmed that counsel for prospective adoptive parents "did do that, yeah."

Raymon thereafter admitted on rebuttal that the telephone number in the screenshot, (650) 458-xxxx, was his. When asked

18

whether Rubye referred to him as "Lil Big Brother," Raymon confirmed "[d]efinitely my little sister calls me that sometimes." Raymon also admitted that when Jessica separated from him, he "accused her of having left [him] for somebody else." Raymon also testified that after Jessica left him, he called her from other individuals' telephones. However, Raymon denied sending the exhibit P-107 text messages to Rubye.

At the close of evidence, the trial court heard argument on the admissibility of exhibit P-107. Raymon's counsel argued, "[T]here's nothing to indicate that it's from Rubye to Jessica. There's absolutely no authentication for where it comes from." Prospective adoptive parents' counsel argued they do not "need to have Rubye testify in order to authenticate it. That's not the law. [¶] I do not need the author or whoever sent the document. That's not the law. [¶] The law is, is that the recipient, in this case [Jessica], can testify that this is a document that she received."

The trial court indicated it was "struggling with the fact it was sent by Rubye.[11] We don't have Rubye here to authenticate. She can't authenticate that was sent by Rubye." The court sustained Raymon's objection "on lack of authentication, double and maybe triple hearsay." The court explained: "You're asking to admit this document based on a hearsay exception, the exception being not used to prove the truth but instead to prove her mental state, but you still have to authenticate that thing

---

[11] Rubye was incarcerated at the time. Raymon's counsel had made arrangements for Rubye to testify and had obtained a minute order for her presence at trial, but at the last moment apparently counsel decided not to call her.

19

you want to be admitted."  The court concluded that exhibit P-107 was not "sufficiently authenticated, and I don't believe it gets authenticated simply by someone receiving a screenshot of a message.  She was not party to the messages themselves."  The court also observed the exhibit was "more prejudicial than probative."

I.	*Ruling and Statement of Decision*

On December 6, 2024, the trial court ruled that Raymon qualified as a *Kelsey S.* father.  The court found Raymon "presented substantial evidence to show that he is just like the natural fathers in *Adoption of Baby Boy W*[.] and *Adoption of H.R.*, by demonstrating his full commitment financially, emotionally, and otherwise to his parental responsibilities for [X.D.]"  (Italics added.)  The court found Jessica's "conduct after leaving the relationship was a deliberate effort to prevent [Raymon] from learning the status of her pregnancy and asserting his parental rights"; the "lies [Jessica] told to Vista Del Mar were clearly meant to prevent [Raymon] from learning about the adoption and asserting his parental rights."  The court reasoned that "unless it is proven that [Raymon] is statutorily unfit to parent, this adoption shall not proceed without his consent."

The court continued, "[I]t is quite significant that although the father knew from the home pregnancy test that turned out to be positive that Jessica was pregnant, . . . it is critical, very critical information that she admitted . . . she did not want to have another child and that he confirmed that . . . she was looking up abortion providers. [¶] She never communicated with him about the pregnancy after they broke up and that left him in the dark about whether she would go through with terminating

20

the pregnancy." The court believed Raymon "didn't have to use the specific words of saying 'I want custody . . . .' He was showing genuine concern about the unborn child, the pregnancy, how it was going, if it was even going because she would not communicate with him about it." "Mother and father had their tumultuous relationship because the father was still using drugs. He hit the mother. She left. She had all reason to leave and I do not fault her for leaving because she does not have to remain in a relationship . . . where she's being slapped in the mouth. [¶] She had every reason to leave. [¶] What I fault her for is lying on these [adoption] documents." She told the adoption agency Raymon "didn't know, he doesn't know he's the dad, and it's not true because they were both there when the pregnancy test took place."

The court continued, "I do believe that the father has demonstrated enough to show this court under *Kelsey S.* that he financially provided for her by sending more than $7,400 to her . . . . [¶] And I believe based on some of the messages, he even showed support and love to her saying, you know, I don't know if you're still pregnant, if you're not, I still love you anyway. He didn't know." The court "believe[d] that emotional support has been shown."

The court ordered bimonthly supervised visits for Raymon with X.D., with a professional monitor present. The court ordered that "no one is to disclose to [X.D.] that [Raymon] is his father. [Raymon] is to be introduced to [X.D.] as just a family friend."

On January 28, 2025, the court issued its statement of decision adopting its earlier proposed decision.

21

Prospective adoptive parents, Jessica, and X.D. each filed a timely notice of appeal.

## DISCUSSION

Because X.D., Jessica, Cliff and Rebecca all joined in each other's arguments, moving forward and unless otherwise indicated, we refer to them collectively as appellants.

First, appellants contend the trial court abused its discretion in excluding exhibit P-107. They argue they had laid an adequate foundation for Raymon's text messages threatening violence. They also argue the exhibit was sufficiently authenticated, relevant, and admissible for both non-hearsay and hearsay purposes. Finally, they claim the exclusion was prejudicial.

Second, appellants argue the trial court's conclusion that Raymon met his burden under *Kelsey S.* was unsupported by substantial evidence. They argue the trial court essentially shifted the burden to Jessica to maintain contact with Raymon, when it is Raymon's obligation to promptly step forward to assume full parental responsibilities and show emotional support.

A. ***The Trial Court Erred in Excluding Exhibit P-107.***

    1. <u>Applicable Law and Standard of Review</u>

A writing must be authenticated before it may be admitted into evidence. (Evid. Code, § 1401, subd. (a).) A photograph or screenshot is a writing; a text message is also a writing. (*Id.*, § 250.) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (*Id.*, § 1400.)

22

The author's testimony is not required to authenticate a writing (*id.*, § 1411); instead, authenticity may be established by the contents of the writing (*id.*, § 1421) or by witness testimony (*People v. Goldsmith* (2014) 59 Cal.4th 258, 268) or by other means (Evid. Code, § 1410 [no restriction on "the means by which a writing may be authenticated"]).  "The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered.  [Citation.]  Essentially, what is necessary is a prima facie case.  'As long as the evidence would support a finding of authenticity, the writing is admissible.  The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*People v. Goldsmith*, at p. 267.)  Like any other material fact, the authenticity of a document may be established by circumstantial evidence.  (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435.)

A trial court's ruling admitting or excluding evidence is reviewable for abuse of discretion, and will not be "disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)  Discretion must be exercised " 'in conformity with the spirit of the law' " and not " 'defeat the ends of substantial justice.' " (*People v. Jacobs* (2007) 156 Cal.App.4th 728, 740–741.)  "[T]he abuse of discretion standard does not allow trial courts to apply an incorrect rule of law." (*County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 316.)

2.    Analysis

We agree with appellants that the trial court abused its discretion in excluding exhibit P-107.

23

A party proffering photographs (e.g., screenshots of text messages) as evidence must authenticate that evidence. (*People v. Calhoun* (2019) 38 Cal.App.5th 275, 314–315; *People v. Perez* (2017) 18 Cal.App.5th 598, 621; *People v. Cruz* (2020) 46 Cal.App.5th 715, 730.) We conclude Jessica's testimony and the identifying information on the exhibit itself were sufficient to authenticate the text message.

Here, Jessica testified she had remained in contact with Rubye during the aftermath of Jessica and Raymon's breakup. Jessica testified she knew Raymon "threatened to kill [her] and [her] unborn child" and referred to a screenshot she received from Rubye concerning "a communication by [Raymon] that contained threats" against Jessica.

The contents of exhibit P-107 contained identifying information consistent with Raymon's own testimony and other admitted evidence. For instance, by his own admission, the telephone number in the screenshot belonged to Raymon. At both his April 15, 2024 deposition and at trial, he verified the phone number (650) 458-xxxx was his. During trial on November 6, 2024, the court verified with both parties' counsel that the telephone number in the screenshots had been authenticated as Raymon's. The telephone number was saved with the contact name "Lil Big Brother"—which Raymon himself testified "[d]efinitely my little sister calls me that sometimes."

Additional evidence supported the conclusion that exhibit P-107 was self-authenticating per Evidence Code section 1421. "A writing may be authenticated by evidence that *the writing refers to or states matters that are unlikely to be known* to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing." (Evid. Code, § 1421,

24

italics added.)  For instance, the references in the text messages to Jessica, the fact that she "left" him, and the author's fear that she was cheating on him, were corroborated by other unchallenged evidence.  Raymon testified at trial that he "acknowledge[d] and admit[ted] that . . . after Jessica left [him], [he] accused her of having left [him] for somebody else."  The text messages refer to the author having called Jessica from other individuals' telephones, a fact that Raymon admitted during his testimony at trial.  It was also self-authenticating given its content that mentioned Jessica was pregnant ("I ho she die and *that baby she carrying* die"), which Raymon had discovered on September 7, 2021.  (Italics added.)  All of this qualifies as "witness testimony, circumstantial evidence, content and location" that supplies authentication of the screenshot itself. (*People v. Goldsmith, supra*, 59 Cal.4th at p. 268; see *People v. Valdez, supra*, 201 Cal.App.4th at p. 1435; see also *People v. Flinner* (2020) 10 Cal.5th 686, 729 [" ' "[A] writing can be authenticated by circumstantial evidence and by its contents" ' "].)

The trial court was mistaken in concluding Rubye's testimony was required to authenticate exhibit P-107 merely because it was *Rubye* who had sent the screenshots to Jessica. "The author's testimony is not required to authenticate a document."  (*People v. Valdez, supra*, 201 Cal.App.4th at p. 1435; see also *People v. Perez, supra*, 18 Cal.App.5th at pp. 619, 621.) The trial court's belief that Rubye's testimony was necessary was erroneous, and its ruling that the screenshots were not authenticated was error.

25

Once authenticated, the exhibit was admissible for both a hearsay and a non-hearsay purpose—not just to show the truth of Raymon's threats, but also Jessica's mental state and her reasonable fear of Raymon. Her state of mind was relevant to explain why Jessica often refused to communicate with Raymon and even lied about the pregnancy and birth. If Raymon had known of the pregnancy, he would have inevitably been thrust back into her life, and according to her would have exposed Jessica and the unborn child again to Raymon's violent and abusive behavior. Even if little weight were to be given to her explanation, at a minimum it provided context for her acts that may have otherwise interfered with Raymon's ability to support her pregnancy and X.D. "When an out-of-court statement is offered for any relevant purpose other than to prove the truth of the matter stated, the statement is not hearsay" and can be received for that limited purpose. (*People v. Wilson* (2021) 11 Cal.5th 259, 305.)

Exhibit P-107 was also admissible for the truth of the matter under various hearsay exceptions. Evidence of a statement made by a witness who is a party opponent, as Raymon was to the adoptive parents, is not made inadmissible by the hearsay rule. (See Evid. Code, § 1220.)[12] To the extent the trial court was concerned about multiple hearsay—Raymon to Rubye to Jessica—each level of communication was either not

[12] Evidence Code section 1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

26

hearsay or subject to an exception.  Once authenticated, the statement (i.e., the text from Raymon to Rubye) was hearsay but qualified as an exception for a statement of a party opponent. The next statement (the screenshot sent from Rubye to Jessica) was offered for the effect it had on Jessica's state of mind and her conduct regarding communication with Raymon about X.D.

Exhibit P-107 was also admissible to prove the truth of the matter—that Raymon had in fact not provided emotional and financial support for Jessica and X.D. in utero.  His threats and other statements were the antithesis of what *Kelsey S.* requires of a father.  (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849; *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1055 (*Michael H.*).)

Finally, the evidence was admissible to prove Raymon's state of mind, both during the time Jessica was pregnant and, by inference, how he was likely to act in the future.  (See Evid. Code, § 1250, subd. (a)(1); *People v. Flores* (2020) 9 Cal.5th 371, 410.)

Raymon's brief refers to exhibit P-107 as "very prejudicial," but he does not fully develop that argument.  His reference to Evidence Code section 352, however, is sufficient for us to address the point on appeal.[13]  Not every damaging piece of evidence is prejudicial under the Evidence Code.  (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)  Prejudice as contemplated by Evidence Code section 352 " 'is not so sweeping as to include any evidence the opponent finds inconvenient.  Evidence is not

---

[13]     Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

27

prejudicial, as that term is used in [an Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, [an Evidence Code] section 352 objection should fail. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.) " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*People v. Doolin*, at pp. 438–439.) Here, there was damaging evidence both ways—death threats, drugs, lies, manipulation, physical violence. Jessica kept the details of her pregnancy from Raymon and even lied to him about X.D.'s existence. This was all damaging to one side or the other. The screenshots at a minimum gave an explanation for Jessica's conduct—that she was afraid that Raymon would act on his threats of bodily harm, even death to her and X.D. It was also relevant on the key issue in the case—whether Raymon qualified as a *Kelsey S.* father.

We have no doubt that the experienced trial court was fully capable of not being *unduly* prejudiced—the standard set by statute—by the evidence put forward by either side. Exhibit P-107 was admissible on several grounds, and it was directly tied to the key ultimate issue of whether Raymon was a *Kelsey S.* father. It was error to exclude it.

28

B.   ***Substantial Evidence Did Not Support the Trial Court's Determination that Raymon Was a* Kelsey S. *Father.***

1.   Applicable Law and Standard of Review

"An unwed father's rights and duties under the Uniform Parentage Act of 1973 (UPA), adopted by our Legislature as Family Code section 7600 et seq., substantially depend on whether he is a 'presumed father' within the meaning of Family Code section 7611." (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1228.)  "Whether a biological father is a 'presumed father' . . . is critical to his parental rights." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 823.)  "In order to become a 'presumed' father, a man must fall within one of several categories enumerated in Family Code section 7611." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 595.)

It is undisputed here that Raymon is the biological father of X.D.  As for the statutory criteria, it is also undisputed that he was not present at X.D.'s birth and did not sign a voluntary declaration of paternity.  Where, as here, a biological father does not fulfill the statutory criteria to qualify as a presumed father, he may nevertheless attain parental rights equal to those of the mother by showing he promptly stepped forward to assume full parental responsibilities for the child's well-being, including a financial, emotional and other commitment; such an individual is often referred to as a *Kelsey S.* father.  (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)

*Kelsey S.* was a private adoption case in which an unwed father was prevented from taking the child into his home, and thereby prevented from becoming a presumed father under the predecessor version of section 7611, subdivision (d).  (*Kelsey S.*,

*supra*, 1 Cal.4th at pp. 821–822, 825.) The biological father sought custody of the infant within two days of the child's birth; about the same time, the child's mother placed the baby with prospective adoptive parents. (*Id.* at p. 822.) Our Supreme Court essentially created a new class of recognized fathers in California—the *Kelsey S.* father.

To satisfy *Kelsey S.* criteria, a child's biological father must show first, that he promptly stepped forward to assume full parental responsibilities for his child's well-being; second, the child's mother or some third party thwarted his efforts to assume his parental responsibilities; and third, a willingness to assume full custody of the child. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) In deciding whether an individual biological father qualifies, trial courts are to consider "all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*, fn. omitted.)

The Supreme Court addressed this issue once more three years later in *Michael H.*, and clarified that a biological father cannot qualify as a *Kelsey S.* father "unless he 'promptly' demonstrated a 'full commitment' to parenthood *during pregnancy* and within a short time after he discovered or

30

reasonably should have discovered that the biological mother was pregnant with his child, and that he cannot compensate for his failure to do so by attempting to assume his parental responsibilities many months *after* learning of the pregnancy." (*Michael H.*, *supra*, 10 Cal.4th at pp. 1054–1055.)

*Kelsey S.* also held that merely seeking to block adoption by others is insufficient. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) "This is so because 'the mere existence of a biological link does not merit . . . constitutional protection' [citation]; rather, the federal Constitution protects only the parental *relationship* that the unwed father has actively developed by ' "com[ing] forward to participate in the rearing of his child" ' [citation] and 'act[ing] as a father.' " (*Michael H.*, *supra*, 10 Cal.4th at p. 1052.)

A determination under *Kelsey S.* is fact specific. On appeal, in reviewing a decision as to whether a parent meets the requirements of *Kelsey S.*, we review the factual findings for substantial evidence and "[t]o the extent that the issue is a mixed question of law and fact, we exercise our independent judgment in measuring the facts against the applicable legal standard." (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.) Substantial evidence is reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged. (*Adoption of Emilio G.* (2015) 235 Cal.App.4th 1133, 1145 (*Emilio G.*).) In the trial court, "[t]he burden is on a biological father who asserts *Kelsey S.* rights to establish the factual predicate for those rights." (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679.) On appeal, appellants must show the evidence is insufficient to support the trial court's findings. (*Emilio G.*, at pp. 1144–1145.)

31

2.    Analysis

In determining whether the evidence is sufficient under this standard, we include in our record review exhibit P-107.  As we have discussed, this evidence should have been admitted at trial.  In that light, we conclude substantial evidence does not support the trial court's finding that Raymon met his burden to show he is a *Kelsey S.* father.

The man seeking the *Kelsey S.* presumption "must demonstrate a full commitment to his parental responsibilities *within a short time after he learned that the biological mother was pregnant with his child.*"  (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 583, italics added, citing *Michael H.*, *supra*, 10 Cal.4th at pp. 1055, 1060 & *Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)  *Kelsey S.* itself makes clear that for the presumption to apply, the unwed biological father must "promptly" come forward to show his full commitment to parental responsibilities.  (*Kelsey S.*, at p. 849.)

We first discuss the timing of Raymon's actions as *Kelsey S.* contemplates.  Here, Raymon learned that he and Jessica were expecting a child on September 7, 2021.  After the physical violence on September 21, 2021, and for the next 14 months, Raymon received no updates from Jessica about the status of the pregnancy or unborn child until November 2022 when she falsely told him that the baby "is not here no more" (even though X.D. had already been born and was six months old).  During that 14-month period, Raymon made no meaningful efforts to investigate or verify the status of the pregnancy or assert his parental rights.  His only actions were occasional text messages inquiring about the unborn child.  The evidence was that, at most, father was passive in his inquiries and never demonstrated a prompt, timely, consistent, and substantial commitment to

32

parenthood. Notably, when Jessica told him that the baby "is not here no more," Raymon did not follow up with any clarifying questions—he did not ask, "Did you miscarry?" or "Did you have an abortion?" or "Did you place the child for adoption?" Rather, he accepted the vague statement at face value and made no effort to understand what had happened to the child.

Raymon's duty to investigate aside, the evidence is almost uncontradicted that, not only was Raymon unsupportive of Jessica emotionally during her pregnancy, his actions were also both physically and emotionally harmful to her. On September 21, 2021, two weeks after learning Jessica was pregnant, Raymon hit Jessica directly in the face causing a bloody lip. This assault occurred while Jessica was sitting next to four-month-old Ray in the back seat of a car. In *Emilio G.*, the appellate court concluded a similar act of domestic violence was, under *Kelsey S.*, "not emotionally supportive" and "actually harmful to [the mother]." (*Emilio G.*, *supra*, 235 Cal.App.4th at pp. 1138, 1145.) In *Emilio* G.*,* the car was stopped when the assault occurred. (*Id.* at p. 1138.) Here, the car was actually moving when the domestic violence took place, which placed pregnant Jessica, the unborn child, and baby Ray at significant risk of serious harm.

Raymon did not follow Jessica to the fast-food restaurant and check on her well-being or that of the unborn child; instead, he drove off, more concerned, as he admitted at trial, about facing the police. It was Raymon's domestic violence that prompted Jessica to seek sanctuary for her and her baby for about year and a half, first at her friend Angie's house, then at a DV shelter, and finally at a sober living center for women and children. In her evaluation report, Dr. Kaser-Boyd found the "issues of greatest concern . . . are the domestic violence of [Raymon] towards

33

Jessica, and his earlier case involving sexual offenses. I understand that he choked Jessica while she was pregnant and this is quite a high level of domestic violence and disregard for the safety of his child." (Italics omitted.) To the extent Raymon found it difficult to contact Jessica over the next many months, it was his drug abuse, violence, and threatening actions that put this in motion.[14]

Throughout Jessica's first trimester, Raymon threatened Jessica and accused her of having an affair. On September 24, 2021, while Jessica was in the DV shelter Raymon left her a voicemail, stating, "Answer my fucking phone calls. You selfish bitch. . . . I swear to God . . . *I'm doing everything I can to hurt you*, bruh." (Italics added.) He left Jessica messages telling her he hated her and called her derogatory names like "dyke" and "selfish bitch." (See *Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 721 ["name-calling, i.e., 'slut,' 'bitch,' and 'whore,' . . . found . . . to be distinctly *unsupportive* and emotionally degrading"].) About a month later, Rubye sent Jessica screenshots (exhibit P-107) of Raymon accusing Jessica of cheating and stated, in part, "cheating bitch when I ketch her *ima kill that selfish bitch* I hate her with all my hear *I swea*[r] *I'll go to jail for life* cheating ass bitch fuck everything *ima make that*

---

[14] The trial court found Jessica acted reasonably after the incident in the car. "The Birth Father's conduct of slapping Birth Mother on September 21, 2021, caused her to leave the relationship. This court finds that Birth Mother had every right to leave Birth Father after he slapped her because domestic violence is unhealthy in any relationship, and a child's emotional and psychological well-being can be negatively impacted by witnessing domestic violence."

34

*bitch hurt that bitch is my enimie I ho she die and that baby she carrying die evel bitch.*"  (Italics added.)

Although "*Kelsey S.* and its progeny do not require the biological father to 'love or dote on the mother, propose marriage to her, or be a compatible mate,' it is required 'that he provide care and support for the mother's physical and emotional health to the extent it affects the health and welfare of the child she is carrying.' " (*Emilio G., supra*, 235 Cal.App.4th at p. 1145.) Raymon's actions and statements were not those of an emotionally supportive partner; far from it.  His conduct cannot be reconciled with the obligation of a *Kelsey S.* father to demonstrate a prompt and full commitment to his parental responsibilities.

Raymon argues that while his "behavior was not perfect, he tried to be emotionally supportive in his own way."  He refers to evidence of his apologies to Jessica; however, apologies for acts of domestic violence are not affirmative support for a pregnant woman.  Raymon's apologies do not carry much weight given as they are part of the ongoing "cycle of violence" commonly found in domestic violence cases.  (See, e.g., *People v. Humphrey* (1996) 13 Cal.4th 1073, 1079 ["[t]he cycle included phases of tension building, violence, and then forgiveness-seeking in which [he] would promise not to batter [her] any more"].)  The evidence showed that Raymon's promise he "won't do that again" was similar to his prior apologies "after all the incidents of abuse."

The sporadic text messages and voicemails from Raymon during Jessica's pregnancy (where he hoped the "pregnancy is going smooth" and was "thinking of [Ray] every day, even my unborn, if there still is an unborn") are legally insufficient to establish the required showing of emotional support, especially in

35

light of the physical violence and threats to hurt or kill Jessica and her unborn baby.

Nor did Raymon seek to establish parental rights once he realized Jessica was not responsive to his requests for updates regarding their unborn child. The circumstances in *Adoption of H.R.* (2012) 205 Cal.App.4th 455 are analogous. In that case, the mother and father had a "rocky" relationship that included allegations of physical abuse, and upon the end of their relationship, mother told father to leave her prenatal care appointment and "changed the paperwork so that he received no further medical information about the pregnancy." (*Id.* at pp. 458–459.) The mother then ceased all contact with the father and contacted an adoption agency and selected adoptive parents. (*Id.* at p. 459.) The father took legal action. When the mother was approximately six months pregnant, the father filed a petition to establish a parental relationship and sought a DNA test to establish his paternity. (*Ibid.*) Raymon could have done the same once he stopped receiving any updates or information about the pregnancy. (*Id.* at p. 457 ["Long before minor was born, father had sought to establish his parental rights."].) Raymon knew from experience how to invoke the court's jurisdiction—having filed in 2015 a petition for custody of, and visitation with, his daughter. Like the father in *Adoption of H.R.*, early on Raymon could have sought a DNA test or filed a petition to establish his paternity of X.D. These legal avenues were available to Raymon, yet he failed to pursue any of them until after the adoptive parents brought legal action following X.D.'s

36

birth. (See also *Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, 448 [father filed a paternity action *before* the child's birth].)[15]

Raymon relies heavily on *Kelsey S.*'s directive that trial courts "consider whether petitioner has done all that he could reasonably do, *under the circumstances*." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 850.) He contends Jessica precluded him from and interfered with his active assumption of parental duties. Raymon contends that, given the circumstances, he did all he could do, thus satisfying *Kelsey S.*

The Court of Appeal in *Adoption of O.M.* gave short shrift to a similar argument. There, the biological father's "ability to demonstrate his commitment was impeded . . . by the predictable consequences of his own criminal activity." (*Adoption of O.M.*, *supra*, 169 Cal.App.4th at p. 675.) The court held that the father had not satisfied *Kelsey S.*, in part, because "his own actions in committing the parole violations, including the use of illegal drugs, [had] led to his incarceration" and prevented him from providing the requisite support. (*Id.* at p. 680.) We find that reasoning applies here too. The evidence here shows Raymon's cocaine and alcohol use coupled with his physical and verbal abuse of Jessica was the direct cause for her decision to leave him

---

[15] Sixteen months before he took any legal action (by filing his declaration opposing adoption), Raymon left voicemails to Jessica and said, "I really don't want to do this, bruh but you're forcing me bro, so I have to make a complaint and then from there, bro, I have to do some type of shit with the court, but I really don't want to go there, bro." The record does not contain any evidence that during the relevant period Raymon sought custody or visitation of his other son, Ray, who had lived with Jessica exclusively from the time Raymon hit Jessica in the car.

and seek safety at a DV shelter. Jessica also received a voicemail from Raymon on September 24, 2021, telling her, "You selfish bitch. . . . I swear to God . . . I'm doing everything I can to hurt you, bruh." She then received from Rubye a screenshot where Raymon threatened to bring harm to Jessica and the unborn child. Domestic violence victims are allowed to insulate themselves from their abuser. It was Raymon's own threats, misconduct, and violent behavior that drove Jessica to seek safety and peace by distancing herself and their unborn child from him. (See *In re D.S.* (2014) 230 Cal.App.4th 1238, 1246 ["We tend to agree that a father whose own bad decisions preclude him from carrying out his parental responsibilities does not satisfy the high bar set by *Kelsey S.*"].)

Raymon argues that he supplied financial support to Jessica and X.D. The trial court found that Raymon "sent at least over $7,400 for anything [Jessica] needed." The record supported that finding, but the evidence also was that the support was for Jessica and Raymon's other son, Ray—not for X.D. Raymon left Jessica a voicemail on December 1, 2021, telling her to use his EBT card "for you and my son [Ray]." Raymon testified at trial that the money he sent to Jessica was meant for her and Ray, not X.D. Raymon's arguments to the contrary on appeal, i.e., that he sent the money for the unborn baby, are inconsistent with his claim that he did not know whether Jessica was still pregnant. Raymon also contends that the funds he sent Jessica for Ray simultaneously conferred an incidental benefit on the unborn child as well; however, he supplied no case authority that this so-called incidental benefit satisfied the financial commitment factor of *Kelsey S.*, and we know of none. We also observe that, although Raymon learned of

38

X.D.'s existence when he was served with a notice of alleged paternity on January 12, 2023, he did not contribute financial support for X.D.'s benefit until a year later, on January 17, 2024, when he sent Cliff and Rebecca a greeting card for X.D. with a cashier's check for $250.

Raymon is correct that after Cliff and Rebecca had commenced adoption proceedings, he took steps to provide support for X.D. and initiated legal proceedings to establish his parental rights. However, *Kelsey S.* requires more than post hoc efforts. The constitutional protection afforded to a biological father's inchoate parental interest depends on his ability to demonstrate a prompt and full commitment to his parental responsibilities beginning shortly after learning of the pregnancy. (See *Kelsey S.*, *supra*, 1 Cal.4th at pp. 849–850.) The evidence here demonstrates Raymon did not. He failed to provide emotional support, and his behavior actually placed Jessica and the unborn child at substantial risk of physical harm. He threatened to harm Jessica and to kill her and the unborn child. His continued drug use in 2021, 2022, and 2023, further underscored his lack of commitment to parental responsibilities. His legal efforts and intermittent financial support came late and do not reflect a showing of "unequivocal commitment to his parental responsibilities." (*Adoption of Baby Boy W.*, *supra*, 232 Cal.App.4th at p. 452.)

We hold substantial evidence does not support the trial court's finding that Raymon met his burden under *Kelsey S.* We thus reverse.

C.      ***It is Not in X.D.'s Best Interest for Raymon to Retain His Parental Rights.***

"Where a natural father does not have presumed father status under section 7611 or a constitutional right to block an adoption under *Kelsey S.*, ' "the child can be adopted without his consent, and his parental rights can be terminated, *unless the court determines it is in the child's best interest for him to retain his parental rights*" ' " (*Adoption of A.S.* (2012) 212 Cal.App.4th 188, 215, italics added) or that the child's adoption be allowed to proceed pursuant to section 7664, subdivision (b).  The court, in making this determination, "may consider all relevant evidence, including the efforts made by the biological father to obtain custody, the age and prior placement of the child, and the effects of a change of a placement on the child."  (§ 7664, subd. (b).)  In contrast, if the court finds that "it is in the best interest of the child that the biological father should be allowed to retain [his] parental rights, the court shall order that the biological father's consent is necessary for an adoption."  (*Id.*, subd. (c).)  Because we have concluded that on this record, Raymon is not a *Kelsey S.* father, it is Raymon's burden to prove that X.D.'s best interest would be served by permitting Raymon to retain his parental rights and not allow the adoption to proceed.  (See *Emilio G.*, *supra*, 235 Cal.App.4th at p. 1151; *Adoption of A.S.*, at p. 218.)

Here, because the trial court found that Raymon was a *Kelsey S.* father, it was not called upon to make findings as to whether X.D.'s best interests would be served by permitting Raymon to retain his parental rights and not allowing the

adoption to go forward.[16] (*Adoption of A.S.*, *supra*, 212 Cal.App.4th at p. 218.) Appellants ask that we determine X.D.'s best interests based on the existing record. Raymon counters that the trial court is the factfinder and in the best position to determine in the first instance whether it is in X.D.'s best interests to allow the adoption to proceed.

On the present record, no reasonable trier of fact could find that "it is in the best interest of [X.D.] that the biological father retain parental rights" and that the adoption not be allowed to proceed. (§ 7664, subd. (b).) Although the record that we have cited in our opinion is overwhelming on the issue of best interests, it is the uncontradicted evidence from expert Dr. Kaser-Boyd's evaluation report that best underscores the point. She observed X.D.'s attachment to Cliff and Rebecca as "strong" and that X.D. is "clearly very bonded to the prospective adoptive parents." (Italics omitted.) X.D. is now nearly three and a half

---

[16] In contrast, when a father *is* found to be a *Kelsey S.* father, the adoption may not go forward without the father's consent unless the court determines the *Kelsey S.* father is statutorily unfit. (*Adoption of H.R.*, *supra*, 205 Cal.App.4th at p. 466.) The trial court understandably did not address either X.D.'s best interests or whether Raymon was unfit. First, because the trial court had found that Raymon *was* a *Kelsey S.* father, by statute it was not required to determine X.D.'s best interests. Second, as the court pointed out in its statement of decision, as of the completion of trial, appellants had not requested a determination of Raymon's fitness as a parent.

Because we have concluded that the *Kelsey S.* finding here was not supported by substantial evidence, the "statutorily unfit" standard has no application. What remains is a determination of X.D.'s best interests.

years old and, since his birth, "knows no other parents than [Cliff] and Rebecca." (Italics omitted.)

Dr. Kaser-Boyd's report observed tellingly that, for a child whose only parental bond since birth has been with adoptive parents, a disrupted attachment at X.D.'s age may result in "mourning and depression and long-term disruptions in trust and security" that could "impact his ability to form a new attachment to a caregiver." (Italics omitted.) When this evidence is viewed in light of Raymon's commission of multiple acts of domestic violence, his history of drug abuse, and other misconduct, a reasonable trier of fact could not conclude that it is in X.D.'s best interests for Raymon to retain his parental rights.

Section 7664 directs the court making a best interest determination to consider factors including "the efforts made by the biological father to obtain custody." (*Id.*, subd. (b).) As discussed, this record shows that Raymon did not demonstrate the prompt and full commitment required under *Kelsey S.* (See *Adoption of A.S.*, *supra*, 212 Cal.App.4th at p. 218.)

Raymon next argues that because the trial court permitted him to visit X.D. twice a month via the court's December 6, 2024 order (although it was not to be disclosed to X.D. that Raymon was his biological father), the events of the past several months should be taken into account. He cites *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1508, for the proposition that assessment of best interests must include consideration of current circumstances.[17] That determination, Raymon claims, should be made following a hearing in the trial court.

---

[17] Based on the trial court's visitation order, Raymon contends on appeal: "*Presumably*, those visits have been occurring for the last seven months. . . . [X.D.] has *presumably*

42

We might agree if there was *anything* in the record—by way of proceedings in the trial court after the notices of appeal had been filed, or by way of an offer of proof or argument that new facts suggest that it is actually in X.D.'s best interests to stop the adoption and allow Raymon to preserve parental rights. There is nothing of the sort in the record or in the briefs on appeal. In light of the existing record and our conclusion that Raymon is not a *Kelsey S.* father, any remand would be founded on the speculation that a reasonable trier of fact could conclude the adoption should not go forward. With this speculation on one side, and the uncertainty and detriment that surely X.D. and the prospective adoptive parents would experience if we authorized further delay by way of another evidentiary hearing and inevitable appeal, we conclude remand for a determination of X.D.'s best interests is both unnecessary and inappropriate. (See *Adoption of Myah M., supra*, 201 Cal.App.4th at p. 1543, citing *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 258 [" 'For young children and those children for whom adoptive parents are available, adoption is usually the preferred placement because it offers the prospect of a secure permanent home.' "].)

---

built some type of relationship with Father." (Italics added.) "Presumably" is not an offer of the existence of evidence.

**DISPOSITION**

We reverse the order finding that Raymon is a *Kelsey S.* father and direct the trial court, on remand, to enter an order permitting the adoption to proceed.

**CERTIFIED FOR PUBLICATION**


RUBIN, J.*

We concur:


WILEY, Acting P. J.


VIRAMONTES, J.

---

\* Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.